**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**



| | | |
|---|---|---|
| | ] | Case Number |
| | ] | |
| Marcus Silver | ] | 2:19-cv-05838-PA-PLA |
| Plaintiff(s) | ] | |
| | ] | |
| v. | ] | |
| Bertram Siegel, et al | ] | |
| | ] | |
| Defendant(s) | ] | |
| | ] | OBJECTION TO |
| | ] | DEFENDANT'S |
| | ] | NOTICE OF |
| | ] | REMOVAL |
| | ] | |

The rules state that "a notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter." Plaintiff did not satisfy the latter option because he was required to serve but he satisfied the first option because the initial pleading/complaint was served via Priority Express Mail on May 22, 2019 and should have been received by May 24, 2019 but even if it took 10 days to be delivered, it would mean a timely request for removal would have needed to be made by July, 2, 2019 but no such request was

devoid of merit.

Defendants mention Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.

Certiorari to the US Court of Appeals for the Eleventh Circuit. No. 97-1909.

Argued March 1, 1999-Decided April 5, 1999 but it is a very poor case to

refference because it is from a different circuit in Alabama and it does more to

help plaintiff"s argument than hurt it. The essential facts of the case are that on

January 26, 1996, respondent Michetti Pipe Stringing, Inc. (Michetti), filed a

complaint in Alabama state court seeking damages for an alleged breach of

contract and fraud by petitioner Murphy Bros., Inc. (Murphy). Michetti did not

serve Murphy then, but three days later it faxed a "courtesy copy" of the file-

stamped complaint to a Murphy vice president. Michetti officially served Murphy

under local law by certified mail on February 12, 1996. On March 13, 1996 (30

days after service but 44 days after receiving the faxed copy of the complaint),

Murphy removed the case under 28 U. S. C. § 1441 to the Federal District Court.

Michetti moved to remand the case to the state court on the ground that Murphy

filed the removal notice 14 days too late under § 1446(b), which specifies, in

relevant part, that the notice "shall be filed within thirty days after the receipt by

the defendant, *through service or otherwise,* of a copy of the [complaint]."

(Emphasis added.) Because the notice had not been filed within 30 days of the

date on which Murphy's vice president received the facsimile transmission,

Michetti asserted, the removal was untimely. The District Court denied the remand

Murphy was officially served with a summons. <u>On interlocutory appeal, the Eleventh Circuit reversed and remanded, instructing the District Court to remand the action to state court. Emphasizing the statutory words "receipt ... or otherwise," the Eleventh Circuit held that the defendant's receipt of a faxed copy of the filed initial pleading</u> sufficed to commence the 30-day removal period. *Held:* A named defendant's time to remove is triggered by simultaneous service of the summons and complaint, <u>or receipt of the complaint,</u> "through service or otherwise". If a fax sent on the third day would suffice then priority express mail including the initial complaint should also be acceptable. The case at bar should be remanded back to state court where despite unlimited resources Defendants defaulted by failing to file a timely response.

Respectfully,

Marcus Silver

Marcus Silver (pro se)

7/15/2019

Date

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| | ] | Case Number |
| | ] | |
| Marcus Silver | ] | 2:19-cv-05838-PA-PLA |
| Plaintiff(s) | ] | |
| | ] | |
| v. | ] | |
| Bertram Siegel, et al | ] | |
| | ] | |
| Defendant(s) | ] | |
| | ] | PROPOSED ORDER |
| | ] | |

The Notice of Removal is fatally deficient because it was filed too late and

therefore the case is hereby remanded back to state court.

Date_____

_____

Honorable Judge Percy Anderson

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS SILVER | **CASE NUMBER:** |
| Plaintiff(s) | 2:19-cv-05838-PA-PLA |
| v. | |
| BERTRAM SIEGEL, et al. | |
| Defendant(s) | **NOTICE TO PARTIES OF COURT–DIRECTED ADR PROGRAM** |

## NOTICE TO PARTIES:

It is the policy of this Court to encourage settlement of civil litigation when such is in the best interest of the parties. The Court favors any reasonable means, including alternative dispute resolution (ADR), to accomplish this goal. *See* L.R. 16-15. Unless exempted by the trial judge, parties in all civil cases must participate in an ADR process before trial. *See* L.R. 16-15.1.

The district judge to whom the above-referenced case has been assigned is participating in an ADR Program that presumptively directs this case to either the Court Mediation Panel or to private mediation. *See* General Order No. 11-10, §5. For more information about the Mediation Panel, visit the Court website, www.cacd.uscourts.gov, under "ADR."

Pursuant to L.R. 26-1(c), counsel are directed to furnish and discuss with their clients the attached ADR Notice To Parties *before* the conference of the parties mandated by Fed.R.Civ.P. 26(f). Based upon the consultation with their clients and discussion with opposing counsel, counsel must indicate the following in their Joint 26(f) Report: 1) whether the case is best suited for mediation with a neutral from the Court Mediation Panel or private mediation; and 2) when the mediation should occur. *See* L.R. 26-1(c).

At the initial scheduling conference, counsel should be fully prepared to discuss their preference for referral to the Court Mediation Panel or to private mediation and when the mediation should occur. The Court will enter an Order/Referral to ADR at or around the time of the scheduling conference.

Clerk, U.S. District Court

_July 8, 2019_
Date

By _/s/ Edwin Sambrano_
Deputy Clerk

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE TO PARTIES: COURT POLICY ON SETTLEMENT
## AND USE OF ALTERNATIVE DISPUTE RESOLUTION (ADR)
### Counsel are required to furnish and discuss this Notice with their clients.

Despite the efforts of the courts to achieve a fair, timely and just outcome in all cases, litigation has become an often lengthy and expensive process. For this reason, it is this Court's policy to encourage parties to attempt to settle their disputes, whenever possible, through alternative dispute resolution (ADR).

ADR can reduce both the time it takes to resolve a case and the costs of litigation, which can be substantial. ADR options include mediation, arbitration (binding or non-binding), neutral evaluation (NE), conciliation, mini-trial and fact-finding. ADR can be either Court-directed or privately conducted.

The Court's ADR Program offers mediation through a panel of qualified and impartial attorneys who will encourage the fair, speedy and economic resolution of civil actions. Panel Mediators each have at least ten years of legal experience and are appointed by the Court. They volunteer their preparation time and the first three hours of a mediation session. This is a cost-effective way for parties to explore potential avenues of resolution.

This Court requires that counsel discuss with their clients the ADR options available and instructs them to come to the initial scheduling conference prepared to discuss the parties' choice of ADR option. The ADR options available are: a settlement conference before the magistrate judge assigned to the case or the magistrate judge in Santa Barbara, the Court Mediation Panel, and private mediation. Counsel are also required to indicate the client's choice of ADR option in advance of the initial scheduling conference. *See* L.R. 26-1(c) and Fed.R.Civ.P. 26(f).

Clients and their counsel should carefully consider the anticipated expense of litigation, the uncertainties as to outcome, the time it will take to get to trial, the time an appeal will take if a decision is appealed, the burdens on a client's time, and the costs and expenses of litigation in relation to the amounts or stakes involved.

Each year thousands of civil cases are filed in this district, yet typically no more than one percent go to trial. Most cases are settled between the parties, voluntarily dismissed, resolved through Court-directed or other forms of ADR, or dismissed by the Court as lacking in merit or for other reasons provided by law.

For more information about the Court's ADR Program, the Mediation Panel, and the profiles of mediators, visit the Court website, www.cacd.uscourts.gov, under "ADR."

Marcus Silver (PRO SE) and posthumously on
behalf of Francine Silver
8613 Franklin Avenue, Los Angeles, CA 90069
Tel 310 945 6105 email marcusdanielsilver@gmail.com

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### INITIAL COMPLAINT

Marcus Silver (pro se) and posthumously ]
on behalf of Francine Silver.               ]
                                            ]
                                            ]
            Plaintiffs                      ]
                                            ]
              v.                            ]
                                            ]
Bertram Siegel, Carole Siegel, David        ]
Siegel, Two Sigma Investments LLP.          ]
                                            ]
            Defendants                      ]
                                            ]
                                            ]
                                            ]
_____]


Bertram, Carole Siegel
1140 Greacen Point Rd,
Mamaroneck, NY 10543-4611

David Siegel/Two Sigma Investments LP
100 Avenue of the Americas
16th Floor, New York, NY 10013

<u>Table of Contents</u>                              <u>Page No.</u>

INTRODUCTION................................................................2

BACKGROUND.................................................................3

NEGLIGENCE................................................................21

GROSS NEGLIGENCE.........................................................22

EMOTIONAL DISTRESS.......................................................23

FRAUDULENT MISREPRESENTATION.............................................24

CONCEALMENT FRAUD........................................................25

CONSPIRACY TO DEFRAUD....................................................25

CONCLUSION...............................................................26

1

<u>Introduction</u>

Plaintiff Marcus Silver and posthumously on behalf of his mother and decedent Francine Silver, and as executor of her estate brings this action to recover $10,000,000.00 in damages for the torts of Negligence, Gross Negligence, Negligent Infliction of Serious Emotional Distress, Intentional Infliction of Serious Emotional Distress, Fraud by Omission, Fraud by Misrepresentation and Conspiracy to Defraud.

Marcus Silver (Marcus) is the son of Francine Silver (Francine). Francine is David Siegel's (David) Aunt and Bertram Siegel's (Bertram) sister. Carole Siegel (Carole) is Bertrams wife and Bertram and Carole are the parents of David who is a founding partner at Two Sigmac llp (Two Sigma). They are the aunt, uncle and cousin to Marcus.

As will be discussed on-going fraud was intentionally perpetrated by the Defendants so damages are tripled. Because as will also be explained, the Defendants conspired with one another to complete their objective, the defendants are jointly and severally liable for damages. In addition,

if this action proceeds to trial, Plaintiff(s) seek Punitive Damages to be assessed and awarded by a Jury - Jury Trial Demanded.

BACKGROUND

Plaintiff's were both Real Estate Investors and were making a comfortable living fixing and flipping homes. In 2005 plaintiff(s) acquired a home in the Hollywood Hills. Defendant(s) visited the home and were impressed - It is unquestionably a nice home in an exclusive part of the Hollywood Hills with an elevator, roof deck and city to ocean views and is valued at around $2.5 million.

Marcus recollects a rather odd comment from Bertram that Marcus did not deserve such a nice home and would not be able to hold on to it. At the time Marcus thought that was a very strange comment and did not pay much attention to it but it stuck in his memory. Also around this time the home was refinanced into a mortgage from Nationwide Lending who then soon went out of business but purportedly assigned the servicing rights on the loan to GMAC. The loan terms were that of an assumable, adjustable rate mortgage tied to the Monthly Treasury average (MTA)and a 5 Year interest only

3

option but apparently coincidently soon after Bertrams visit the loan went crazy. First false mortgage lates were recorded on Francine's credit report even though she was in her 80's and had never been late in her life. Francine only found out her credit was being ruined when she applied for a mortgage on a neighbouring property that she planned to acquire but was declined a mortgage due to the false late payments on her credit report. Someone else acquired the home for $1.5 million and immediately flipped it for $2.5 million without even painting it or doing any type of remodelling. These types of investment opportunities do not come up very often and by the time her credit was restored the deal had long since passed. Unfortunately for Plaintiff(s) soon after the credit was repaired, the interest only option was incorrectly suspended in year 3 instead of year 5 resulting in payments that were about $3,000 a month more than the agreed upon terms. Plaintiff(s) made the additional payments for almost an entire year with the expectation that the billing problem would be resolved - But no way! Letters were not answered and phone calls were disconnected! The assumability option was also incorrectly denied making it harder to sell and market the home.

4

To clarify the terms of the mortgage, adjustable rate mortgage payments are calculated by adding a margin which never changes and in this case was 2.875% to an index. There is more than one type of index and they can all adjust up or down. Plaintiff(s) specifically refinanced into a loan that was supposed to be indexed to the the MTA (monthly treasury average) but GMAC calculated the interest rate based on the 1 year Treasury bill resulting in a higher interest rate. Eventually it became clear the billing issue would not be resolved and GMAC did not even know who they were servicing the loan for or how to calculate the correct interest rate and payment options. Francine was forced into Bankruptcy where she hoped to resolve the issue of rate and terms on the loan. The day before GMAC were supposed to answer Francine's questions in court, on May 12, 2012 GMAC and it's parent company Residential Capital, llc also declared bankruptcy in the Southern district of New York and they still remain in bankruptcy all this time later.

Somehow Bertram learned of Plaintiff's problems with the mortgage and called up Marcus to ask what was going on.This was at the very beginning of the problems with the mortgage

and Marcus was at that time confident that the billing issue would be resolved but it was not. Bertram and Carole stayed in regular contact with plaintiff(s). Bertram and Carole called Marcus at the outset of the problems to let him know they were aware of the problems and could do nothing to help although they did offer $10 or $20 for a handicapped toilet seat for Francine - Marcus had to relay this conversation to Francine - It was not an offer to help - It was to taunt and create emotional distress which is exactly what happened. Another time Bertram called while Marcus was visiting Francine in hospital where she was recovering from a fall in which she fractured her neck and hand. Marcus asked Bertram if he would like to speak to Francine but he angrily stated that he just wanted to know the prognosis! Francine was present and wanted to know who called and why they did not want to speak to her and Marcus had to explain.

Marcus eventually got to the point where he did not want anything to do with Bertram or Carole and sent a text message asking for them to please stop contacting Marcus as he was no longer willing to answer their questions or satisfy their morbid curiosity. Calls that had occured prior

to this included questions from Bertram and Carole like "on a scale from 1-10 how stressed, depressed, angry are you? What are your finances looking like? How are you affording to pay your lawyer?" Plaintiff(s) had to liquidate everything including furniture and a funeral plot to pay legal fees. Defendant's knew plaintiff(s)were drowning in debt and legal expenses.

Eventually Francine who it seems was at least partially aggravated into an early grave or in this case a mausoleum because the funeral plot had been sold and plaintiff(s) had not had the financial wherewithal to replace it. Francine was laid to rest about 10 feet up in the air where she will apparently remain for eternity or until the building collapses.

Defendant(s) craftily and sneakfully garnered close personal information not available to anyone else, did everything to aggravate, nothing to help and refused to disclose their interest in Ocwen and GMAC. Had plaintiff(s) known of the defendant(s) interest in Ocwen and GMAC, they would have acted much differently.

7

After Marcus asked Bertram to stop contacting him, Bertram
sent a check for $100 (attachment 1) which went uncashed as
Marcus still did not want to talk to Bertram or Carole.
On April 25, 2015 David came to meet Plaintiff(s)for dinner
(attachment 2). Plaintiffs thought it was going to be a
family meeting but David showed up with his business
assistant which was surprising to plaintiff(s). Really it
seems it was a business meeting meant to garner inside
information not available to anyone other than trusted,
close family members. It was a pleasant dinner at the time
although plaintiff(s) were a little confused as to why
david's business assistant was there. It took a couple of
years and some research but plaintiff(s) would later learn
that the business meeting that David was in town for was
being held in Beverly Hills by the Milken Foundation and was
being attended by some of the wealthiest, most influential
people on the face of the planet. David was a guest speaker
and apparently of the select people in attendance were the
key decision makers at GMAC.  Plaintiff(s) would never have
agreed to the meeting with David and his business assistant
if they had been aware that David had a major financial

8

interest and would be hobnobbing with key people at GMAC the next day. As plaintiff(s) were not aware of what was happening, the conversation at dinner was friendly. Francine's health came up and she explained she did not want to see doctors because she was not happy with her choice of doctors.  When they heard this, David and his assistant looked at one another like they just hit the lottery. Marcus also laughed at the time thinking that David and his assistant were laughing because Francine's was somewhat eccentric but it later became clear that it was for a different reason. Plaintiff(s) would later learn that Defendant(s) were major investors in Ocwen and GMAC!

At the time of writing this complaint Marcus is only aware that Defendant(s) were major investors but is unaware of the amount but expects to learn more in the discovery process. For now, if for example Defendant(s) have a 1% stake in Ocwen who are now foreclosing on the home which is valued at around $2.5 million, that translates into a $25k interest in the home and Ocwen is not paying that money to Nationwide or any party that funded the loan because they are all out of business! Pool trusts that contained most or all of the

loans were largely over-insured so if borrowers did not pay, the pool would fail and the original investors in the loans had a financial windfall from the insurers pay outs and this was the best way to garner the maximum profit.

Plaintiff(s) absolutely believe borrowers should pay back the money they borrowed - Just not to charlatans and fraudsters who never loaned a penny, did not pay any other party, did not know the loan terms or who they were purportedly servicing the loan for, over-billed and destroyed the livelihood and credit of Plaintiff(s).

Francine wanted to find out what was really going on and did not trust GMAC anymore so she had a forensic loan audit conducted which revealed that her loan had been securitized and placed in a trust back in 2006.

To conform with with relevant pool, tax and trust laws, nothing can get transferred in or out of the trust after the 2006 deadline but plaintiff(s)loan was not assigned until 2011 - 5 year too late, plus the signatures on the assignments to GMAC were done by a person who worked in the

10

same office were it was admitted that tens of thousands of assignments were being fraudulently created every month on a need to have basis. Two Judges in California and a hand writing specialist all found the signatures on Francine's purported loan assignments to be false with one Judge in the California Bankruptcy case referring to them as "blatant examples of robo-signing" but the NY Bankruptcy Judge, who plaintiffs believe lacked jurisdiction ignored the California rulings and found the signatures to be valid, in fact the Judge in New York legitimized loans across the nation, many of which that have already been paid off by third parties and pretty much all of which are missing valid assignments. A financial windfall for Ocwen and GMAC.

Marcus had even gone to the Los Angeles County Recorder's Office, did some searching and quickly found about a dozen other homes just in Los Angeles that GMAC had assigned after the closing date making the assignments void in a legitimate court of law. Francine submitted this evidence to the NY Bankruptcy Court but they refused to record or acknowledge them. There were many other problems with the courts in NY. There were originally 2 judges presiding over

the NY Bankruptcy case but early on in the case one judge resigned from the bench and joined the law firm representing the debtors. The former judge is allowed to do that but the other active judge must recuse himself from that particular case because of impartiality issues. Instead the judge presided on the case but refused to abide by the terms of the agreed upon settlement plan or relevant state and federal laws. In NY the courts apparently do what the banks want and in this case it meant legitimizing about $12 billion worth of apparently late, fabricated assignments.

The settlement plan in the NY Bankruptcy case was voted on and became effective on December 12, 2013 and called for holders of allowed claims to be paid immediately or as soon as reasonably possible. Francine had submitted a $3 million claim that was listed as allowed on the effective date and should have been paid immediately but she was being given the runaround. Francine made a motion for payment of her claim in March, 2014 and GMAC did not respond - They defaulted and the claim should have been paid but instead the Judge who should have recused himself acted as defense counsel and issued a belated response on behalf of the

12

non-responsive defaulting debtors, a further example of his lack of impartiality. This is not an example of an impartial judge.

The terms of the settlement plan also made it impossible for any party including the judge to object to claims that were deemed allowed on the effective date but the judge ignored this condition as well and ultimately allowed a late objection to the settlement. An appeal was made to the NY District Court where once again Residential Capital/GMAC failed to respond. This time instead of issuing a response on behalf of the defaulting debtor's the judge simply retroactively extended the deadline for a response rendering Francine's motion for default judgment useless - See attachments 3.

The case was eventually appealed again to NY District Court. This time the Judge Nathan presided. Before being appointed to the Bench, the Judge had worked on the $ multi-billion bail out of GMAC. The judge had also presided over the GMAC ignition scandal where for years GMAC knowingly let people burned to death or get seriously injured.The judge gave GMAC

deferred prosecution! It does not seem like an impartial court system in NY. By contrast, in San Francisco someone had a house party where people died in a fire and the hosts are now facing life in prison.

There were a lot of shenanigans in New York. The Bankruptcy Court eventually approved the sale of $12 billion in servicing rights from GMAC to Ocwen at less than a penny on the dollar - Just no legitimate paperwork! Francine tried to convey this to the courts but it fell on the deaf ears of a judge in NY who clearly lacked impartiality .

Because Ocwen was not sure what index the loan was linked to or who they were servicing it for, they too tried to collect more than called for in the loan terms and must surely be doing the same to others. It is a financial windfall for them because the loan assignments should be void in any legitimate court.  For Defendant(s) a 1% interest in $12 billion worth of loans, providing the assignments can be produced translates to a $120 million interest.

Ultimately the Court of Appeals in California affirmed the

14

California District Court ruling that the NY Bankruptcy case had resolved the matter. Francine's $3 million claim was never paid and now Ocwen has restarted the foreclosure process and the issue of rates and terms were never ever resolved.

Francine was a significant litigant in the Residential Capital/GMAC bankruptcy and out of over 10,000 claims, Francine's claim was one of the first to be filed and was one of the very last few claims to be decided.

Plaintiff(s) should have been informed of Defendant's significant financial interest in the companies that plaintiff's were in brutal litigation with for over 7 years. Fishing for information not available to anyone other than trusted, close family members, acting like a concerned family member and not informing of a major financial interest in the companies that plaintiff(s) were in litigation with is fraud by misrepresentation/omission and concealment.

Defendants are all geniuses or else highly educated with

multiple doctorates. They must regard plaintiff(s) as idiots and indeed the highest level of education is an AA that Marcus received from Santa Monica Community College. David and Two Sigma psychologically profiles employees by amongst other things, the type of music they listen to and they have some of the fastest computers on the face of the planet which are used for high frequency trading where Two Sigma basically seems to outwit most of the stock traders around the planet.

Bertram and Carole were very aware of the conversations they were going to have, what they were going to ask and how they would mock and taunt. They were very aware that plaintiff(s) were struggling to pay bills and survive. Bertram came to visit and made a point of taking lots of photos of the house - not of his family. Bertram noticed plaintiff(s) had lost weight and had a very small appetite - It was because Plaintiff(s) could no longer afford the same diet and also could not afford new clothes and the old ones were now too big. Francine suffered from numerous health problems including an irregular heart beat, arthritis, bad knees, dementia, alzheimer's disease and advanced cataracts. She

16

was in bad shape mentally and physically and was scared
because she could not afford to die and if she lived it was
likely the home would be foreclosed on - A daunting outlook
and it seemed Bertram and Carole were doing everything
possible to aggravate her situation. When Bertram came to
visit Plaintiffs took him to Santa Monica Pier. Bertram told
Marcus he wanted to talk to him and started walking at a
fast pace. Francine was dependant on a walker and was
struggling to keep up. Marcus told Bertram to slow down.
Marcus can't help thinking that it was Bertrams hope and
intention that Francine would fall or have a heart attack
but at the time Plaintiff(s) had no idea that defendant(s)
were major investors in Ocwen and GMAC and had no reason to
suspect such a horrible thing.

Marcus's email was repeatedly hacked but the only one
who purportedly believed the ridiculous emails was Bertram -
See attachment 4. Bertram knew Marcus could not be in
Jamaica as per the email because Francine needed constant
care that only Marcus could provide and Bertram knew
plaintiff(s) had no money for vacations. Marcus called up
his Internet service provider and their technical team said

17

the had never seen such a serious type of hacking with files being deleted real time while Marcus was on the phone with them - They advised Marcus to call the FBI which he did but they declined to investigate and just suggested getting a new email account. Marcus knows of no person or company that could or would hack his computer other than David or Two Sigma.

Interestingly, Marcus and David's Uncle Harry who is a World War II veteran and will be turning 100 years old this year was living about 5 minutes down the road and around the corner from the restaurant where plaintiffs had diner with David. David never visited him. Harry would later ask Marcus if David offered to help The answer was no! One would reasonably think any concerned family member who is billionaire and also apparently on the Stanford University Board of Directors for Philanthropy and provides healthcare to hundreds of employees would do a little more than laugh at hearing his Aunt's plight.

During the diner meeting plaintiff(s) had with David, Bertram's well being came up and Marcus conveyed his regards

to Bertram. This restored and reignited the relationship between Marcus and Bertram but the same type of conversations continued with Bertram constantly prying for information and explaining there was nothing he could do to help although in one conversation Bertram and Carol both advised that Marcus could consult with them on how to get free health care if it could be shown that plaintiff(s) were homeless and indigent. They suggested transferring title of the home from Francine to Marcus but that would have ended any further litigation so it was not good advice.

It was not until several Years later that Marcus would learn that defendants were major investors in GMAC and also in Ocwen who purportedly acquired the servicing rights from GMAC for less than a penny on the dollar. There was a small problem - No paperwork. This problem was solved in the Residential Capital/GMAC Bankruptcy case. The court legitimized the sale to Ocwen who continued overbilling and were unable to identify who they were servicing the loan for.

In 2011 the litigation process against GMAC and then in 2013

against Ocwen began. Francine died on Thanksgiving -
November 22, 2018. Her case against Rescap/GMAC/Ocwen was
decided against her in the California Court of Appeals in
January, 2019.


Eventually in what turned out to be their last conversation,
Bertram again asked about the home and Marcus responded by
asking Bertram how he learned of the problems with the
mortgage because neither Marcus or Francine had let
defendant(s) know of the problems and also at the time
expected to resolve them. Bertram would not give an answer
and quickly excused himself from the call. A few days later
Defendant(s) Bertram and Carole both spoke to Francine to
let her know that they would not be contacting her or Marcus
anymore or sending any money. The intended purpose of the
call was to inflict intentional emotional distress and that
it exactly what happened. Marcus witnessed the call. Usually
Marcus would walk away from phone conversations that
Francine was having, but in this instance the conversation
was so brief that Marcus did not have a chance to walk away.
Marcus could not help noticing that Francine looked gaunt
and shocked after the conversation but she did not want to

discuss it for about 1 week and then she finally disclosed the nature of the call to Marcus. Later Marcus would learn and have to inform Francine that her family were major investors in Ocwen and GMAC, that she had been defrauded out of her inheritance and been deprived of the opportunity of seeing her or Marcus seeing their mother/grandmother Rose before she died so that the objective of defrauding Francine out of her inheritance could be completed. It was hard for Francine being in her 80's and having to learn these things after having loved and cared for her younger brother Bert and his family for so many years.

The final communication from David was a New Years card for 2018 (attachment 5) Attachment 6 contains an article relevant to David and Two Sigma.

Negligence

Negligence can occur as a result of the type of Fraudulent Conduct outlined in this complaint. Under California law, Negligence is a legal concept by which people are held responsible for their actions. Negligence describes conduct that falls below a standard of care. It is part of the law

that explains why a person should pay for injuries they've caused. The elements of negligence include a duty, a breach, causation and damages. Duty is generally understood as the duty to use reasonable care. The law imputes the duty to most people. California negligence law is codified at **Civil Code 1714** which provides that everyone is responsible for injuries and states "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person" This statute is the foundation of negligence law in California and regards **negligence** as the failure to use reasonable care to prevent harm to oneself or to others. A person can be negligent by acting or by failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation.

<u>Gross negligence</u> is the lack of any care or an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others.

A person can be grossly negligent by acting or by failing to act. Plaintiff(s) believe Gross negligence occurred due to the reasons and facts already discussed.


Emotional Distress

Under California law Emotional distress includes (without limitation): suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame.  Serious emotional distress exists if an ordinary, reasonable person would be unable to cope with the mental stress engendered by the circumstances of the case. For the reasons and facts already discussed both plaintiffs  were subjected to all of the above elements for a claim of severe emotional distress. Defendant's actions were also quite intentional so a claim for intentional infliction of severe emotional distress exists along with a claim for negligent infliction of severe emotional distress. Defendants had a reckless disregard for the health and safety of plaintiffs and clearly knew that emotional distress would result.

23

Fraudulent Misrepresentation

A defendant has committed fraudulent misrepresentation when
six factors have been met: A representation was made,the
representation was false, that when made, the defendant knew
that the representation was false or that the defendant made
the statement recklessly without knowledge of its truth
that the fraudulent misrepresentation was made with the
intention that the plaintiff rely on it that the plaintiff
did rely on the fraudulent misrepresentation that the
plaintiff suffered harm as a result of the fraudulent
misrepresentation. All of the required elements were
satisfied because Defendant's Bertram, Carole and David all
represented themselves as concerned family members and hid
the fact that they were either directly or vicariously
heavily invested in the companies through Two Sigma that
plaintiff's were in litigation with, they garnered insider,
close, personal information and when plaintiffs learned of
the truth it caused shock, horror, anger, sadness and left
plaintiff's both feeling betrayed.

24

## Intentional fraud and deceit

Intentional fraud and deceit occur when the perpetrator uses deceit (false important facts) to convince the victim to rely on the false facts. Then the victim reasonably relied on and was harmed by the deceit. For the reasons already discussed intentional fraud and deceit occured.

## Concealment fraud

Concealment fraud occurs when there is a fiduciary or other relationship between the parties where there is a duty of full disclosure. The concealing person, with an intention to deceive, does not disclose important facts that the concealing person knows but the victim does not and could not know. Further, the victim reasonably relied on and was harmed by the concealment. For the reasons and facts already discussed concealment fraud occurred for many years.

## Conspiracy to Defraud

A conspiracy occurs when two or more people agree to commit an illegal act or a legal act in an illegal way and take some step toward its completion. As already described, because multiple defendants worked together in defrauding

Plaintiffs, conspiracy to defraud occurred.

Conclusion

Unwavering trust, love and kindness for almost 90 years were repaid with dishonesty, greed, evilness and betrayal to the point where numerous torts occurred including gross negligence, negligent infliction of serious emotional distress and intentional infliction of serious emotional distress as well as Fraud by Omission and Fraud by Misrepresentation/deceit and conspiracy. By trickery and omission Defendant's garnered highly sensitive and personal information not even available to Plaintiff's lawyers, only to a trusted and loved family member but Plaintiff(s) had no idea of the extent of fraud and betrayal they were facing from their own family members who were once held in the highest possible regard until it was discovered that despite having become one of the most wealth families on the face of the planet they had apparently succumb to unparallelled Wall Street greed and would happily defraud anyone including elderly widows and children even if they are family members. As Francine's health started failing Marcus had to go through over 50 years of paperwork and discovered his

26

Grandmother's last will and testament (attachment 7).
Francine was not even aware it was in her possession.
Apparently Francine was in the will but received nothing and
apparently other family members who were children at the
time also did not receive their share as intended in the
will. At the time  of her mother Rose's death Francine
(referred to as Frieda) was living in London, England and
back then transatlantic flights and telephone calls were
quite a luxury. One day out of the blue Bertram called to
let Francine know that her mother had died and was being
buried the next day. Francine was in shock and flew to NY
the next day for the funeral and then immediately returned
to London.


When Francine's health started to decline, Marcus asked
Bertram how Rose had died but he said he could not remember
- That is not believable. After finding the will, it is
apparent Bertram did not want to answer the question because
Rose was likely sick for some time and it was hidden from
Francine so she could be defrauded out of her inheritance
even though it was probably not for much. Rose lived in a
bad section of the Bronx and did not appear to be wealthy

policy or other motives. With all this deception in mind

Marcus has to wonder about the extent of fraud defendants

are involved in and how high up it went but certainly both

Francine and Marcus were the victims of an on-going

conspiracy to commit fraud and inflict severe emotional

distress for which the defendants are now being held liable.


Jury Trial Demanded.


Respectfully

Marcus/Silver


28



**CHASE** ⬡

CHASE ONLINE BILL PAYMENT
PO BOX 15944
WILMINGTON  DE 19850--594
(800) 472-6236

Apply to Acct  **FROM BERT**

BERTRAM SIEGEL
1140 GREACEN POINT RD
MAMARONECK  NY 10543-4611

345967369
25-3/440
10-24-2014



Dollars

Pay   ONE HUNDRED AND 00/100

$100.00

Check Void After 90 Days

78605 BPC 001 011 14297 - 345967369 1 OF 1
FRANCINE SILVER
8613 FRANKLIN AVE
LA  CA 90069

To
the
Order
of

JPMorgan Chase Bank, N.A. Columbus, Ohio

⑈345967369⑈ ⑆044000037⑆  658533063⑈

Marcus Silver <marcusdanielsilver@gmail.com>

## Dinner with David Siegel on Sat, April 25

8 messages

**Sheri Vammen** <Sheri.Vammen@twosigma.com>                    Tue, Mar 31, 2015 at 10:32 AM
To: "marcusdanielsilver@gmail.com" <marcusdanielsilver@gmail.com>
Cc: Chelsea Stewart <Chelsea.Stewart@twosigma.com>

Marcus,

It was very nice speaking with you today.  David is looking forward to seeing you and Fran during his
upcoming visit to the LA area.  As I mentioned, he will be in Beverly Hills for a business conference arriving
the afternoon of Saturday, April 25 and departing the afternoon of Monday, April 27.  He's tied up with the
conference on Sunday and Monday, but he would like to get together with you and Fran for dinner on
Saturday evening.  Please make a suggestion for dinner plans and timing.  David would be very happy to
meet at a local restaurant or your home – whatever works best for you.

I've copied Chelsea Stewart here who also assists with David's calendar and trip planning.

With kind regards,

Sheri

**Marcus Silver** <marcusdanielsilver@gmail.com>                    Thu, Apr 2, 2015 at 8:31 PM
To: Sheri Vammen <Sheri.Vammen@twosigma.com>

Hi Sheri,

We are very flexible and looking forward to seeing David. Here are my suggestions - Reservations are not
a problem so David can let us know the time and what suits his appetite closer to the time:

Rainbow Bar and Grill - 9015 Sunset Blvd,  90069
Tenmasa Sushi 9016 Sunset Blvd
Chin Chin Chinese 8618 Sunset Blvd
Cafe Med 8615 Sunset Blvd
Saddle Ranch Steak House 8371 Sunset Blvd

Thanks,

Marcus
[Quoted text hidden]

**Sheri Vammen** <Sheri.Vammen@twosigma.com>
To: Marcus Silver <marcusdanielsilver@gmail.com>
Cc: Chelsea Stewart <Chelsea.Stewart@twosigma.com>

Tue, Apr 7, 2015 at 5:35 AM

Marcus,

Thank you for the recommendations. David would enjoy Tenmasa Sushi. Let's plan on that in the 6:30pm or 7:00pm range on Saturday, April 25ᵗʰ and we can reconfirm details as we get a bit closer.

Best wishes,

Sheri

---

**Sheri Vammen** <Sheri.Vammen@twosigma.com>
To: Marcus Silver <marcusdanielsilver@gmail.com>
Cc: Chelsea Stewart <Chelsea.Stewart@twosigma.com>

Tue, Apr 7, 2015 at 5:38 AM

Marcus,

As a matter of fact, David could meet for dinner even earlier (say 5:30pm) if that's better for your mother. Please advise on this. He can be flexible.

Thank you,

Sheri

---

**Marcus Silver** <marcusdanielsilver@gmail.com>
To: Sheri Vammen <Sheri.Vammen@twosigma.com>

Tue, Apr 7, 2015 at 12:43 PM

Hi Sheri,

Sounds good, we can lock it in closer to the time.

Best,

Marcus

---

**Sheri Vammen** <Sheri.Vammen@twosigma.com>
To: Marcus Silver <marcusdanielsilver@gmail.com>
Cc: Chelsea Stewart <Chelsea.Stewart@twosigma.com>

Tue, Apr 21, 2015 at 9:08 AM

Hello Marcus,

David is looking forward to dinner with you and Fran this Saturday evening. What time would you like to meet at Tenmasa Sushi on Sunset Blvd?

Best regards,

[Quoted text hidden]

---

**Marcus Silver** <marcusdanielsilver@gmail.com>                    Tue, Apr 21, 2015 at 10:19 AM
To: Sheri Vammen <Sheri.Vammen@twosigma.com>
Cc: Chelsea Stewart <Chelsea.Stewart@twosigma.com>

Hi Sheri and Chelsea,

We are looking forward to seeing David too! We are close by and flexible. Does 6PM PST sound good? Let me know.

Thanks.

[Quoted text hidden]

---

**Sheri Vammen** <Sheri.Vammen@twosigma.com>                    Tue, Apr 21, 2015 at 10:53 AM
To: Marcus Silver <marcusdanielsilver@gmail.com>
Cc: Chelsea Stewart <Chelsea.Stewart@twosigma.com>

6pm on Saturday is perfect. I just made a reservation under David Siegel at Tenmasa's 9016 Sunset Blvd location.

[Quoted text hidden]

---

**Marcus Silver** <marcusdanielsilver@gmail.com>                    Tue, Apr 21, 2015 at 12:17 PM
To: Sheri Vammen <Sheri.Vammen@twosigma.com>
Cc: Chelsea Stewart <Chelsea.Stewart@twosigma.com>

Great – Thanks!

[Quoted text hidden]

ATTACHMENT se 3 P. 18/2

SDNY CM/ECF Version 5.1.1

uscourts.gov

ECF | Query | Reports | Utilities | Logout |

1290 Avenue of the Americas
New York, NY 10104
(212) 468-8000
Fax: (212) 468-7900
Email: mrosenbaum@mofo.com
LEAD ATTORNEY
ATTORNEY TO BE NOTICED

| Date Filed | # | Docket Text |
|---|---|---|
| 05/20/2014 | 1 | NOTICE OF APPEAL FROM THE BANKRUPTCY COURT TO THE S.D.N.Y. from the Order of Judge Martin Glenn dated March 26, 2014. Bankruptcy Court Case Numbers: 12-B-12020 (MG). Certified copies of the record. Document filed by Francine Silver. Appellant Brief due by 6/3/2014. (bkar) (Entered: 05/20/2014) |
| 05/20/2014 | 2 | DESIGNATION OF BANKRUPTCY RECORD ON APPEAL re: 1 Bankruptcy Appeal. Document filed by Appellant Francine Silver. (bkar) (Entered: 05/20/2014) |
| 05/20/2014 | 3 | COUNTER DESIGNATION OF BANKRUPTCY RECORD ON APPEAL Document filed by Appellee ResCap Borrower Claims Trust. (bkar) (Entered: 05/20/2014) |
| 05/20/2014 | 4 | REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Francine Silver. (bkar) (Entered: 05/20/2014) |
| 05/20/2014 | | Magistrate Judge Andrew J. Peck is so designated. (bkar) (Entered: 05/20/2014) |
| 05/20/2014 | | Case Designated ECF. (bkar) (Entered: 05/20/2014) |
| 05/23/2014 | 5 | SCHEDULING ORDER: An appeal of an Order of the Bankruptcy Court of the Southern District of New York having been filed and both appellant and appellee having submitted their designation of record on appeal, it is hereby ORDERED: that appellant's memorandum of law in support of its appeal shall be submitted by August 7, 2014; appellee's opposition shall be submitted by November 6, 2014; and appellant's reply shall be submitted by February 5, 2015. IT IS FURTHER ORDERED that when filing any papers with the Court, the parties shall provide one courtesy copy to United States Courthouse, 500 Pearl Street, Rm 410, New York, New York 10007. (Signed by Judge George B. Daniels on 5/22/2014.) (mro) (Entered: 05/23/2014) |
| 06/02/2014 | 9 | Appellant's BRIEF. Document filed by Francine Silver. Appellee Brief due by 6/16/2014. (sac) (Entered: 06/04/2014) |



ATTACHMENT 3 P2a2

Firefox File Edit View History Bookmarks Tools Window Help          Mon 10:29 AM

SDNY CM/ECF Version 5.1.1

SDNY CM/ECF Version 5.1.1

USCOURTS.gov

ECF

| 05/23/2014 | 3 | SCHEDULING ORDER: An appeal of an Order of the Bankruptcy Court of the Southern District of New York having been filed and both appellant and appellee having submitted their designation of record on appeal, it is hereby, ORDERED; that appellant's memorandum of law in support of its appeal shall be submitted by August 7, 2014 appellees opposition shall be submitted by November 6, 2014, and appellant's reply shall be submitted by February 5, 2015. IT IS FURTHER ORDERED that when filing any papers with the Court, the parties shall provide one courtesy copy to United States Courthouse, 40 Centre Street, Rm 410, New York, New York 10007. (Signed by Judge George B. Daniels on 5/22/2014) (mro) (Entered: 05/23/2014) |
| 05/02/2014 | 6 | Appellant's BRIEF. Document filed by Francine Silver. Appellee Brief due 7/16/2014. (sac) Modified on 6/27/2014 (sac). (Entered: 06/04/2014) |
| 06/05/2014 | 7 | AFFIRMATION OF SERVICE of Appeals Brief served on Norman Rosenbaum, Morrison & Foerster, 1290 Ave. of the Americas, New York, NY 10140 on 6/2/14. Service was made by Mail. Document filed by Francine Silver. (dcf) (Entered: 06/05/2014) |
| 06/06/2014 | 8 | MOTION FOR CASE 14CV3634 (GBD) TO BE CERTIFIED FOR APPEAL TO THE COURT OF APPEALS. Document filed by Francine Silver. (so) (Entered: 06/06/2014) |
| 06/19/2014 | 9 | MOTION FOR A DEFAULT JUDGMENT BY FRANCINE SILVER as to the debtors in this action. Document filed by Francine Silver. (sc) (Entered: 06/20/2014) |
| 06/20/2014 | 10 | MEMORANDUM OF LAW in Opposition re: 8 MOTION for Certificate of Appealability. . Document filed by ResCap Borrower Claims Trust. (Rosenbaum, Norman) (Entered: 06/20/2014) |
| 06/24/2014 | 11 | AFFIDAVIT OF SERVICE of The ResCap Borrower Claims Trust's Memorandum of Law in Opposition to Francine Silver's Motion for Certification of Appeal to Court of Appeals (Docket No. 10) on 6/20/14. Service was made by Electronic Mail and Overnight Mail. Document filed by ResCap Borrower Claims Trust. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Rosenbaum, Norman) (Entered: 06/24/2014) |
| 06/26/2014 | 12 | RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S MEMORANDUM OF LAW IN OPPOSITION TO FRANCINE SILVER'S MOTION FOR CERTIFICATION OF APPEAL TO THE COURT OF APPEALS re: 10 Memorandum of Law in Opposition to Motion. Document filed by Francine Silver. (sc) (Entered: 06/27/2014) |
| 06/27/2014 | 13 | ADDENDUM TO THE RESPONSE TO THE RESCAP BORROWER CLAIMS TRUST'S MEMORANDUM OF LAW IN OPPOSITION TO FRANCINE SILVER'S MOTION FOR CERTIFICATION OF APPEAL TO THE COURT OF APPEALS. re: 12 Response. Document filed by Francine Silver. (sc) (Entered: 06/30/2014) |

PACER Service Center

ATTACHMENT 4 ~ PI or 3

Bert Siegel <bert@siegel.com>
RE:
December 19, 2012 2:57:32 PM PST
MARCUS SILVER <marcussilver@sbcglobal.net>

OK Stay in touch. Uncle Bert

Date: Wed, 19 Dec 2012 14:55:31 -0800
From:
Subject: Re:
To:

Hi Bert,

I'm sorry but someone seems to be sending that message to my contacts under my email address but it is not me – Please disregard it is some form of spam or virus!

From: Bert Siegel <                >
To: MARCUS SILVER <                >
Sent: Wed, December 19, 2012 2:36:35 PM
Subject: RE:

Hi Marc: I really do not know what you want me to do? I read the site and now what o you want me to do? GPB.

Date: Tue, 18 Dec 2012 16:42:05 -0800
From:
Subject: RE:
To:

hey check this out

ATTACHMENT 4 P2a3

Barry Gates <Barry@lifealert.com>
**Your email may have beed hacked**
June 23, 2014 9:11:23 AM PDT
MARCUS SILVER <marcussilver@sbcglobal.net>
1 Attachment, 2.4 KB

Hey Mark,

I hope all is well. I received the following email from you:

I really hope you get this fast. I could not inform anyone about my trip, because it was impromptu. we had to be in Manila,Philippines for a program, The program was successful, but our journey has turned sour. we misplaced our wallet and cell phone on our way back to the hotel we lodge in after we went for sight seeing. The wallet contained all the valuables we had. Now, our passport is in custody of the hotel management pending when we make payment.
I am sorry if i am inconveniencing you, but i have only very few people to run to now. i will be indeed very grateful if i can get a short term loan from you ($2,600 USD) this will enable me sort our hotel bills and get my sorry self back home. I will really appreciate whatever you can afford in assisting me with. I promise to refund it in full as soon as soon as I return. let me know if you can be of any assistance. Please, let me know soonest.
Thanks,
Marcus


I would change your password and advise everyone on your contact list to disregard this message. If you really need my help, call me from the hotel.


Barry Gates
Sales Manager
800-344-4533 Ext. 4101

ATTACHMENT 4 P3a3

## Hotels

**Marcus Silver** <marcusdanielsilver@gmail.com>                    Mon, Sep 7, 2015 at 9:06 PM
To: bert@siegel.com

Dear Uncle Bert,

Further to our conversation, the closest hotel is the Grafton                    or the Andaz

Best.





Case 1:19-cv-05826-VA-RLA   Document 9   Filed 07/15/19   Page 47 of 58   Page ID #:155

# MATH-STERS OF THE UNIVERSE

GALILEO BELIEVED THAT MATHEMATICS WAS THE LANGUAGE GOD USED TO WRITE THE UNIVERSE. FOUR HUNDRED YEARS LATER A BRILLIANT PRACTITIONER AND A COMPUTER SCIENTIST ARE QUIETLY TRANSLATING THESE SECRETS—INTO THE NEWEST GREAT HEDGE FUND FORTUNE. (PITY THE EMPLOYEES WHO GET IN THEIR WAY.)

BY NATHAN VARDI



L AST YEAR SOME OF THE nation's greatest math minds gathered at Manhattan's elegant Tribeca Rooftop for stunning views, fancy food and wine—and a series of complex equations to determine who among them would be king of the geeks. The annual event was hosted by the Museum of Mathematics, which was underwritten in 2012 by Google and the world's richest quantitative Wall Street traders, including Renaissance Technologies' billionaire founder, James Simons.

In the end there was little surprise that the finals featured Terence Tao, 40, considered one of the greatest mathematicians of this generation. A professor at UCLA, Tao has won the Fields Medal, often described as the Nobel Prize of math, and the $3 million Breakthrough Prize. But Tao didn't win that night. He was beaten in the final round by a secretive Wall Street hedge fund manager named John Overdeck, who solved a problem involving infinite sequences and prime factorization. In fact, it was the second time in its short history Overdeck, also a backer of the museum, had won the competition.

Like Tao, Overdeck is a math genius, but unlike his contest rival, he never wanted to be a professor. After winning a silver medal at the International Mathematical Olympiad in Poland at age 16, young Overdeck told the *Washington Post* that writing papers didn't seem fulfilling and instead he wanted to make the math "do something."

Do something? How about build the fastest-growing big hedge fund on the planet and make multibillionaires out of its two founders? Overdeck, 45, and partner David Siegel, 54, run Two Sigma Investments, a little-known quantitative hedge fund firm that gathers seemingly random

RODRIGO DAMATI FOR FORBES



The math men of Two Sigma: John Overdeck (left) and David Siegel.

bits of information and tries to detect patterns that can be used to forecast the price direction of stocks and other securities. They are card-carrying members of the growing tribe of quants who use big data and machine learning in an attempt to beat the market consistently. And they join the ranks of the most successful of such traders, including James Simons (worth $14 billion), Ken Griffin (worth $7 billion) and David Shaw (worth $4.7 billion).

Within the last five years Overdeck and Siegel's for-profit Wall Street think tank has quietly swelled from $5 billion to $28 billion in assets—one of the biggest hedge funds in America, even besting Simons' Renaissance. What is yet more impressive is that Overdeck and Siegel's rocket-science-fueled operation is able to command fees in its biggest fund of 3% of assets and 30% of profits, versus the industry standard of 2-and-20. The firm's biggest fund, Spectrum, has earned an annual average return of 9.4% net of fees since 2004. Growth + returns + whopping fees = a great wealth-building formula. This year Overdeck and Siegel debut on The Forbes 400, each with a net worth estimated at $2.8 billion.

"The challenge I think facing the investment world is that the human mind has not become any better than it was 100 years ago, and it's very hard for someone using traditional methods to juggle all the information of the global economy in their head," Siegel said at an investor conference earlier this year. In fact, Two Sigma's data scientists and systems analyze more than 10,000 data sources, using 75,000 CPUs with 750 terabytes of memory. Their hedge funds have executed more than 1.2 billion trades over the last 14 years.

Said Siegel: "Eventually the time will come that no human investment manager will be able to beat the computer."

So in a world where investors should effectively be

shorting the likes of Warren Buffett in favor of faceless machines like IBM's Watson, where math formulas can create immense wealth, it is no surprise that Overdeck and Siegel are obsessive about avoiding publicity and keeping the firm's secrets under wraps. (Overdeck and Siegel declined to comment to FORBES.)

But Two Sigma's breakneck pace has created a big challenge for its founders. Putting all that money to work means stretching beyond its core competencies. The firm has expanded into reinsurance, venture capital and marketmaking. And it requires a never-ending supply of young

> **"EVENTUALLY THE TIME WILL COME WHEN NO HUMAN INVESTMENT MANAGER WILL BE ABLE TO BEAT A COMPUTER."**

math whizzes. Its core hedge fund operation, run out of offices in Manhattan's SoHo district, now employs more than 800 researchers, computer programmers and statisticians, including 130 Ph.D.s and 6 International Math Olympiad winners. Most staffers are plucked straight out of the computer science, mathematics and engineering programs of MIT, Carnegie Mellon and Caltech. Instead of competing with Goldman Sachs and George Soros, Two Sigma opens its checkbook to compete for top talent with Silicon Valley firms like Google and Facebook.

But those big packages—a twentysomething researcher can take home $550,000—come at a price. Even in the sharp-elbowed trading culture, Two Sigma has proved exceptionally aggressive when it comes to protecting its methods and methodology, to the point where some employees who have tried to leave the nest have been sued, prosecuted—and jailed. These math nerds shoot to kill.

# THE D.E. SHAW MAFIA

**THE PAYPAL MAFIA BUILT PAYPAL AND WENT ON TO OTHER SUCCESSES THAT SHAPED SILICON VALLEY AND PRODUCED THREE FORBES 400 MEMBERS: ELON MUSK, PETER THIEL AND REID HOFFMAN. BUT PIONEERING QUANT HEDGE FUND FIRM D.E. SHAW HAS NURTURED THE CAREERS OF FOUR FORBES 400 MEMBERS.**



**David Shaw**
Founder,
D.E. Shaw
NET WORTH
**$4.7 billion**



**Jeff Bezos**
Founder,
Amazon
NET WORTH
**$47 billion**



**John Overdeck**
Cofounder, Two
Sigma Investments
NET WORTH
**$2.8 billion**



**David Siegel**
Cofounder, Two
Sigma Investments
NET WORTH
**$2.8 billion**

JOHN OVERDECK GREW UP IN THE well-to-do Maryland suburbs between Baltimore and Washington, D.C. His father was a mathematician at the National Security Agency, and his mother, who had a master's in math, managed a computer company. At 16, Overdeck was studying at Stanford University, where he ultimately earned a degree in math and a master's in statistics, but he dropped out before getting his doctorate. In 1992 he was recruited by D.E. Shaw, the quant hedge fund of billionaire computer scientist David Shaw. There he rose to managing director in charge of risk management but after nearly seven years left to start another D.E. Shaw alum, Jeff Bezos, at his upstart Seattle-

FROM LEFT: NO CREDIT; DAVID RYDER / GETTY IMAGES; AMANDA GORDON / BLOOMBERG; THOS ROBINSON / GETTY IMAGES



based online bookseller.

At Amazon, Overdeck was Bezos' first shadow, following him everywhere he went. Then Overdeck was assigned to work on customer-relationship issues, building a services architecture for recommendations and customer reviews and supervising some 90 employees.

Rather than remain a well-paid cog in Bezos' retailing juggernaut, Overdeck quit Amazon in 2001 to return to Wall Street to form his own data-driven hedge fund with Siegel, another D.E. Shaw refugee.

Siegel is the stereotypical computer nerd. A native of suburban Westchester County, N.Y., he is an ardent believer that technology makes everything better. He has a Ph.D. from MIT in computer science with a specialty in artificial intelligence. Prior to forming Two Sigma with Overdeck, Siegel worked at billionaire Paul Tudor Jones' New York hedge fund, Tudor Investments. In fact, when Two Sigma launched in 2001—the early days of computer-driven "electronic trading"—Tudor Investments was the key investor, providing the startup with space in its offices at One Liberty Plaza.

What's the significance of the name Two Sigma? According to those familiar with the firm, sigma with a lowercase "s" is the ratio of an investment's volatility to its excess return—that is, the return above benchmark. This is a

> **TRADING TACTICS USE MACHINE LEARNING. COMPUTERS ANALYZE DATA, ADAPT TO CHANGES AND REACT ON THEIR OWN.**

key factor in deciding how much capital an optimal portfolio should allocate to a given investment. The second meaning of sigma—with a capital S—denotes sum.

From inception Two Sigma's early funds, like Eclipse and Spectrum, focused on trading stocks globally. Eclipse was faster, changing positions within weeks, while Spectrum had a longer-term horizon closer to one month.

The duo eventually used their algorithms to create programs that operate outside the global stock markets, like the trend-following Compass funds that bet on futures markets. In 2014 another important fund, Horizon, was folded into Spectrum, which had diversified its offering beyond stocks. One of Two Sigma's least visible funds is its Partners Fund, an internal fund of funds, fueled mostly by capital from the founders.

Inside the firm Overdeck presides over the construction of models while Siegel handles the engineering and infrastructure that support the technology used to make predictions. Think of Two Sigma as the kitchen at a top restaurant. Overdeck is the master chef, approving the recipes and preparing the meals. Siegel is the manager, ensuring that the kitchen is humming with ingredients, pots,

ovens and electricity.

Two Sigma researchers spend time testing existing models, and each researcher is expected to come up with two or three new models per year. These are presented to Overdeck in a white paper that is typically less than ten pages long. Since Two Sigma's trading models can change its forecast in seconds, lots of back-testing goes into each model. It's not unlike the way Amazon exhaustively tests various Web-page changes in real time to ensure optimal clicks and purchases. At Two Sigma headquarters the model builders, who need to write code, sit with the engineers and collaborate with them all the time.

Two Sigma builds trading algorithms around four kinds of information: technical information like trading volumes of stocks; event-based information such as credit agency actions, mergers or other news; fundamental data like corporate financial statements; and so-called alpha capture, which is often company- or industry-specific intelligence, not publicly available per se and gathered via proprietary surveys. Alpha capture is controversial. In fact, Two Sigma suspended a survey of stock research analysts last year after BlackRock entered into a settlement agreement with New York's attorney general, who claimed a similar BlackRock survey unfairly gave it access to information about companies ahead of other investment banking clients.

For many trades different kinds of models and data are used in combination. For example, the hedge fund may be signaled to buy a stock if a new analyst report is greeted with low volume. Cutting-edge trading tactics are also deployed, including the application of machine learning or artificial-intelligence techniques, where Two Sigma's computers extract information, adapt to changing market environments and react on their own. When the humans overseeing the models intervene, it's usually only to increase or dial back risk.

One of the biggest risks for Two Sigma is that its models work in theory but that the idiosyncrasies of limited data render them useless when applied to the real world. "It's really hard to ascertain whether this kind of strategy has real merit or whether it's a mirage of statistical computer might," says David Bailey, a mathematician and noted computer scientist affiliated with the University of California, Davis, who co-wrote a paper suggesting that these strategies are often "spuriously validated." Siegel emphasized this issue at an investment conference this year: "You have to formulate your big-data analysis in a way that you can understand whether or not you are over-fitting the data or actually extracting legitimate information out of the data—that is what the business is all about."

While some big hedge fund investors, like $13 billion SkyBridge Capital, shun what they view as black-box

## THE FORBES 400 | TWO SIGMA

quants like Two Sigma, there is no shortage of investors clamoring for consistent returns made possible by science. Since the financial crisis and the Madoff debacle, institutional investors have rushed to larger hedge funds with established systems and controls. By 2008 Two Sigma already had $4.6 billion in assets and 200 employees, while other similar-size value funds had far fewer employees.

Moreover, Two Sigma's returns have been respectable and consistent. While many other big funds suffered losses this summer—the core definition of a "hedge" fund has pathetically morphed from downside protection to the heads-I-win, tails-you-lose 2-and-20 payment model—Two Sigma deftly navigated the volatility. Spectrum was up by about 6% net of fees in the first eight months of 2015.



### RETURNS HAVE BEEN STEADY. WHILE MANY LOST MONEY IN AUGUST, TWO SIGMA DEFTLY NAVIGATED THE VOLATILITY.

The $6 billion Compass fund had a big 2014, up 25.6%. Since inception in 2005 it has logged an annualized return of 14.9%. In August it gained 2.8% versus a 6% decline for the S&P 500. A leveraged version of Compass doubled that, up 5.7% during the turbulent month. Another big fund, Absolute Return, rose 6.1% in the first eight months of 2015.

Returns like these mean the money will continue to pour into Two Sigma. Last year, in fact, the firm raised $3.3 billion for a new macro fund, one of the biggest initial fundraisings in years.

TWO SIGMA'S OFFICES ARE THE KIND of place where you might trip over someone's homemade remote-control car or look on as custom chess sets are created by 3-D printers in its hacker lab. On certain walls you can view colorful digital algorithmic art developed by an employee. There are hack nights, when staffers collaborate intensely on software-related projects like getting machines to play the videogame Dr. Mario. Robots have been built to challenge staffers to games of shuffleboard.

There are no suits or ties, just sweaters, collared shirts, khakis and jeans. People don't work exceptionally hard by Wall Street standards, and they get paid well. Junior researchers in their 20s, for example, can make half a million dollars a year in salary and bonuses. The firm has a retention rate of 97%.

It sounds like an idyllic environment for would-be math professors or comput-

er scientists—until they try to go off on their own. When Overdeck and Siegel feel threatened by the departure of a key employee, the lawsuits start flying, and on more than one occasion departing employees have faced criminal prosecution and jail time.

In 2006 Two Sigma sued Jianjun Qiu, a Two Sigma researcher who the firm claimed stole intellectual property and fled to his homeland of China. Two Sigma had hired Qiu in 2004, but within two years he was escorted out of its offices and placed on leave pending an investigation.

Two Sigma later claimed in court filings that Qiu had downloaded massive amounts of Two Sigma data to a home computer and refused to let the hedge fund inspect it. After being interrogated by the firm's lawyers, Qiu sent an e-mail to his manager saying he had left for China. Two Sigma sent someone to meet with Qiu in China, where the hedge fund claimed he admitted taking "ten computer hard drives" of data, which he refused to return. The hostilities ended abruptly after Two Sigma settled its lawsuit with Qiu, who returned to the U.S. and ultimately went to work at other financial firms, including billionaire Ken Griffin's Citadel.

In 2010 an employee in Two Sigma's Houston office came under suspicion and was summoned for a meeting at the Manhattan headquarters. Upon arrival he was greeted by New York City police officers and promptly arrested—Two Sigma suspected the employee had taken sensitive computer algorithms. The company alerted the Manhattan district attorney. The employee ended up pleading guilty to a misdemeanor count of unauthorized use of a computer and left the firm.

Two Sigma's most prominent criminal case against



# FORMULA FOR SUCCESS
EXPLOSIVE GROWTH HAS PUT TWO SIGMA IN THE HEDGE FUND ELITE.

PAULSON & CO. — $31B (2010), $19B (2015)
RENAISSANCE TECHNOLOGIES — $15B (2010), $27B (2015)
TUDOR INVESTMENT CORP. — $11B (2010), $13B (2015)
CITADEL — $11B (2010), $26B (2015)
TWO SIGMA INVESTMENTS — $5B (2010), $28B (2015)

THE FORBES 400 | TWO SIGMA

an employee involves Chinese national Kang Gao, a then 28-year-old researcher who gave notice to the hedge fund in 2014. Gao had worked at Two Sigma since 2010, after graduating from MIT with degrees in physics and engineering.

In early 2014, when Gao was preparing to leave, Two Sigma claims, he e-mailed himself some of the firm's trading models. After exploring his options, he ultimately accepted a position at Citadel but agreed not to start right away, in accordance with his one-year noncompete; he planned to spend his free time studying. Two Sigma notified Cyrus Vance Jr., the Manhattan district attorney, that it believed Gao had stolen its intellectual property. So after Gao's recorded exit interview in February 2014, he was arrested on charges of unauthorized use of secret scientific material and unlawful duplication of computer-related material.

Gao pleaded not guilty but declined to meet the $500,000 bail set by the judge. Gao's lawyer, Marc Agnifilo, reasoned that because Gao was a resident alien he was headed to jail one way or the other. Two Sigma informed the government of Gao's situation, and his work visa was revoked, depriving him of immigration status. He would thus have been transferred to federal immigration jail if he put up bail, leaving his lawyers with limited access to him as they mounted his defense.

Instead the boyish-looking, bespectacled Gao chose to apply for a tourist visa and wait for approval in the local jail, New York City's notorious Rikers Island. During Gao's eight-month detention he suffered through ex-

## DURING GAO'S EIGHT-MONTH DETENTION HE WAS BEATEN. THIS HASN'T ENDED TWO SIGMA'S QUEST TO PUNISH HIM.

tended lockdown periods and was beaten up. While Gao's IP-theft case never gained the notoriety of that of Sergey Aleynikov, the former Goldman Sachs programmer sent to the slammer and immortalized in Michael Lewis' book *Flash Boys*, Gao has endured nearly as much jail time as Aleynikov, whose conviction has been overturned.

The criminal case against Gao accuses him of taking two trading models he developed in 2011 and 2012. He was also accused of taking a research paper and a research presentation that he wrote. Says Gao's lawyer, "How can taking math be secret scientific material? It's math."

In February 2015, just four months after leaving Rikers, Gao pleaded guilty to one count of unlawful duplication of computer-related material and was sentenced to time already served. He then returned to China. This hasn't stopped Overdeck and Siegel in their quest to punish him. In addition to accusing Gao of taking its property, Two Sigma filed a civil suit against Gao around

the same time he was arrested.

The judge in the case, Jeffrey Oing, has been openly hostile to Overdeck and Siegel's hedge fund. "Aren't you guys going over the top in terms of this, to put someone in jail for a breach of duty?" he said in a 2014 hearing. "What caused him to have you guys, other than being totally annoyed and angry at him, to do this?" Now Two Sigma is initiating an arbitration case against Gao, seeking over $300,000 in damages. Gao's lawyer has tried to stop it by arguing that his client has already spent $100,000 on the civil action alone.

In early 2015 a senior analyst at Aberdeen Asset Management, an investor in Two Sigma, told Two Sigma's London office that Aberdeen had been approached by a former Two Sigma employee about a new hedge fund. Other firms like Deutsche Bank and UBS were similarly approached.

The inquiry came from Sergey Fein, 34, a computer scientist recruited from Russia's St. Petersburg National Research University. Fein had worked at Two Sigma in Manhattan for seven years, ultimately rising to the level of vice president. Unlike most researchers at Two Sigma, Fein had worked on all four of Two Sigma's proprietary investment disciplines. When he resigned in May 2014, Two Sigma elected to apply its one-year noncompete and pay him $210,000, 40% of his $525,000 annual compensation.

But in March 2015 Overdeck and Siegel got wind of Fein's discussions about a new quant fund. Two Sigma then delivered a threatening letter to Fein's would-be partners. Within days Fein's plans fell apart as partners abandoned the effort. But that wasn't enough. The next month Two Sigma sued Fein in a New York State court. Fein has denied violating his contractual obligations to Two Sigma, saying he and his partners held only exploratory talks with potential investors and didn't raise any money or open a brokerage account. Fein said he hoped to raise the money after the noncompete expired.

"I have to ask Two Sigma a question," Judge Oing began during the lawsuit's initial hearing. "Did you seek to put Mr. Fein in jail?" Oing continued: "It sounds to me like it's like the same thing that happened with the other action."

Two Sigma did not contact law enforcement but wanted the judge to extend Fein's noncompete for seven months, the length of time by which Two Sigma claimed he had breached the initial deal. Judge Oing refused, saying he didn't have the authority, and closed the case, ordering Fein not to violate the initial deal for its remaining five weeks.

Fein should consider himself lucky. Overdeck and Siegel have concocted arguably the greatest hedge fund success story of post-meltdown America. And they've clearly done the brass-knuckled math: When that success is derived around formulas and equations, you do whatever is necessary to keep your numbers to yourself. Ⓕ

(Pl or 4)

# LAST WILL AND TESTAMENT

I, ROSE SIEGEL, of the County of Bronx, State of New York, being of sound mind and memory, do hereby make, publish and declare this to be my LAST WILL AND TESTAMENT, as follows:

FIRST: I hereby revoke all former wills and codicils by me made.

SECOND: I hereby direct that all of my just debts and funeral expenses be paid as soon after my death as is practicable.

THIRD: All of the rest, residue and remainder of my property and estate, both real and personal, and howsoever the same may be represented, and wheresoever the same may be located or situated shall be divided into four (4) equal shares, which I hereby give, devise and bequeath as follows:

(a)  ONE SHARE to BEATRICE DANER, if she survives me, or if she does not survive me "per stirpes" to those of her issue who survive me;

(b)  ONE SHARE to BERTRAM SIEGEL, if he survives me, or if he does not survive me "per stirpes" to those of his issue who survive me;

(c)  ONE SHARE to FRIEDA SILVER, if she survives me, or if she does not survive me "per stirpes" to those of her issue who survive me;

(d)  ONE SHARE to MARLENE SIEGEL, DEBORAH SIEGEL, SIDNEY SIEGEL and JEANETTE SIEGEL, absolutely and forever, share and share alike, and in the event that any one or more of said persons shall have predeceased me, the share to which each deceased person would have been entitled if then living is given, devised and bequeathed to his or her issue, in equal shares, per stirpes, and if there be no such issue then living, to the survivors or survivor of such persons.

FOURTH: In the event any of my legatees is under the age of twenty-one years at the time his or her share is to be paid over and delivered to him or to her, then, and in such event, I hereby direct that each such share shall be paid over and delivered unto the Testamentary Trustee herein-after named, IN TRUST NEVERTHELESS, to administer such Trust

(b)  ONE SHARE to BERTRAM SIEGEL, if he survives me, or if he does not survive me "per stirpes" to those of his issue who survive me;

(c)  ONE SHARE to FRIEDA SILVER, if she survives me, or if she does not survive me "per stirpes" to those of her issue who survive me;

(d)  ONE SHARE to MARLENE SIEGEL, DEBORAH SIEGEL, SIDNEY SIEGEL and JEANETTE SIEGEL, absolutely and forever, share and share alike, and in the event that any one or more of said persons shall have predeceased me, the share to which each deceased person would have been entitled if then living is given, devised and bequeathed to his or her issue, in equal shares, per stirpes, and if there be no such issue then living, to the survivors or survivor of such persons.

FOURTH:  In the event any of my legatees is under the age of twenty-one years at the time his or her share is to be paid over and delivered to him or to her, then, and in such event, I hereby direct that each such share shall be paid over and delivered unto the Testamentary Trustee herein-after named, IN TRUST NEVERTHELESS, to administer such Trust as hereinafter directed; and as each such child arrives at the age of twenty-one years, the balance of the corpus of such child's share, in Trust, together with any accumulations, shall be paid over and delivered to such child.

FIFTH:  I hereby nominate, constitute and appoint BEATRICE DANER, as Testamentary Trustee hereunder, she to serve without security, bond or undertaking, and in the event she is dead at the time of my death or in the event she does not choose to be appointed as such Testamentary Trustee for any reason whatsoever, then, and in either event, I hereby



(P 3 of 4)

SECOND PAGE

nominate, constitute and appoint BERTRAM SIEGEL and FRIEDA SILVER, as Testamentary Trustees hereunder, they to serve without security, bond or undertaking.

SIXTH: The Trustee is to make payments, in her or their sole discretion, exercised from time to time, in any one or more of the following ways: (a) directly to such beneficiary, (b) directly in payment of the expenses of support, maintenance, education, and welfare of such beneficiary, (c) to the legal or natural guardian of such beneficiary, (d) or to any relative or guardian of the person of such beneficiary who shall have custody and care of the person of such beneficiary. The Trustee shall not be obliged to see to the application of the funds so paid, but the receipt of such payee shall be full acquittance to the Trustee and the Trustee may, in her or their sole discretion, make such payments in such amounts and at such times as she or they deem best; and said Trustee may invade the trust principal and corpus for the purposes and to the extent she or they deem best to carry out this trust; and to do all other acts which, in her or their judgment, may be necessary or appropriate for the proper and advantageous management, investment and distribution of the trust estate.

SEVENTH: I hereby nominate, constitute and appoint BEATRICE DANER, as Executrix hereunder, and she shall not be required to furnish any bond or other security in any jurisdiction for the faithful performance of her duties; and in the event she is dead at the time of my death or is not appointed as such Executrix for any reason whatsoever, then, and in either event, I hereby nominate and appoint BERTRAM SIEGEL and FRIEDA SILVER as Executors hereunder, they to serve without bond, security or undertaking.

EIGHTH: I hereby authorize my Executrix or Alternate Executors to sell publicly or privately for cash or on time, without an order of court, upon such terms and conditions as to her or them shall seem best, any property, real or personal, included in the estate and the purchaser shall not be required to see to the application of the proceeds.

IN WITNESS WHEREOF, I have hereunto subscribed my name the 9 day of May, 1971.

S// ROSE SIEGEL L.S.
Rose Siegel

WE, whose names are hereto subscribed, DO CERTIFY that the testatrix above named, subscribed her name to this instrument

the purchaser shall not be required to see to the application of the proceeds.

IN WITNESS WHEREOF, I have hereunto subscribed my name the 9 day of May, 1971.

S// ROSE SIEGEL    L.S.
Rose Siegel

WE, whose names are hereto subscribed, DO CERTIFY that the testatrix above named, subscribed her name to this instrument in our presence, and in the presence of each of us, and at the same time, she declared in our presence and hearing that the same was her Last Will and Testament, and requested us, and each of us, to sign our names thereto as witnesses to the execution thereof, which we hereby do in the presence of the testatrix and of each other, this 9 day of May, 1971, the day of the date of said will, and write opposite our names our respective places of residence.

JULIA SCHORE          residing at  9 Jean Lane, Monsey, N.Y.
ROBERT SCHORE         residing at  9 Jean Lane, Monsey, N.Y.

CIV-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: | | FOR COURT USE ONLY |
|---|---|---|---|

NAME: MARCUS SILVER (PRO SE)
FIRM NAME:
STREET ADDRESS: 9613 FRANKLIN AVE
CITY: LOS ANGELES   STATE: LA ZIP CODE: 90069
TELEPHONE NO.: 310 945 6105   FAX NO.:
E-MAIL ADDRESS:
ATTORNEY FOR: (name):

**Received**

**JUL 15 2019**

**Default Section**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. HILL ST
MAILING ADDRESS:
CITY AND ZIP CODE: L.A. CA 90012
BRANCH NAME: STANLEY MOSK

Plaintiff/Petitioner: MARCUS SILVER
Defendant/Respondent: BERTRAM SIEGEL et al

| REQUEST FOR (Application) | ☑ Entry of Default ☐ Court Judgment | ☐ Clerk's Judgment | CASE NUMBER: 19STCV17949 |
|---|---|---|---|

**Not for use in actions under the Fair Debt Buying Practices Act (Civ. Code, § 1788.50 et seq.) (see CIV-105)**

1. TO THE CLERK: On the complaint or cross-complaint filed
   a. on (date): 5/22/19
   b. by (name): MARCUS SILVER
   c. ☑ Enter default of defendant (names): BERTRAM SIEGEL, CAROLE SIEGEL, DAVID SIEGEL, TWO SIGMA INVESTMENTS LP.

   d. ☐ I request a court judgment under Code of Civil Procedure sections 585(b), 585(c), 989, etc., against defendant (names):

      (Testimony required. Apply to the clerk for a hearing date, unless the court will enter a judgment on an affidavit under Code Civ. Proc., § 585(d).)
   e. ☐ Enter clerk's judgment
      (1) ☐ for restitution of the premises only and issue a writ of execution on the judgment. Code of Civil Procedure section 1174(c) does not apply. (Code Civ. Proc., § 1169.)
         ☐ Include in the judgment all tenants, subtenants, named claimants, and other occupants of the premises. The Prejudgment Claim of Right to Possession was served in compliance with Code of Civil Procedure section 415.46.
      (2) ☐ under Code of Civil Procedure section 585(a). (Complete the declaration under Code Civ. Proc., § 585.5 on the reverse (item 5).)
      (3) ☐ for default previously entered on (date):

2. Judgment to be entered.

| | Amount | Credits acknowledged | Balance |
|---|---|---|---|
| a. Demand of complaint . . . . . . . . . . . . | $ 30,000,000.00 | $ 0 | $ 30,000,000.00 |
| b. Statement of damages* | | | |
| (1) Special . . . . . . . . . . . . . . . . . . . | $ | $ | $ |
| (2) General . . . . . . . . . . . . . . . . . . | $ | $ | $ |
| c. Interest . . . . . . . . . . . . . . . . . . . . | $ | $ | $ |
| d. Costs (see reverse) . . . . . . . . . . . . | $ | $ | $ |
| e. Attorney fees . . . . . . . . . . . . . . . . | $ | $ | $ |
| f. TOTALS . . . . . . . . . . . . . . . . . . . . | $ 30,000,000.00 | $ 0 | $ 30,000,000.00 |

   g. Daily damages were demanded in complaint at the rate of: $ _____ per day beginning (date): _____
   (* Personal injury or wrongful death actions; Code Civ. Proc., § 425.11.)

3. ☐ (Check if filed in an unlawful detainer case.) Legal document assistant or unlawful detainer assistant information is on the reverse (complete item 4).

Date: 7/15/19   MARCUS SILVER   ►   [signature]

(TYPE OR PRINT NAME)   (SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)

| FOR COURT USE ONLY | (1) ☐ Default entered as requested on (date): | |
|---|---|---|
| | (2) ☐ Default NOT entered as requested (state reason): | |
| | Clerk, by _____, Deputy | Page 1 of 2 |

Form Adopted for Mandatory Use
Judicial Council of California
CIV-100 [Rev. January 1, 2018]

**REQUEST FOR ENTRY OF DEFAULT**
**(Application to Enter Default)**

Code of Civil Procedure, §§ 585–587, 1169
www.courts.ca.gov

CIV-100

| Plaintiff/Petitioner: MARCUS SILVER | CASE NUMBER: |
| Defendant/Respondent: | 19STCV17949 |

4. **Legal document assistant or unlawful detainer assistant** (Bus. & Prof. Code, § 6400 et seq.). A legal document assistant or unlawful detainer assistant ☐ did ☑ did **not** for compensation give advice or assistance with this form. If declarant has received **any** help or advice for pay from a legal document assistant or unlawful detainer assistant, state:

   a. Assistant's name:
   b. Street address, city, and zip code:

   c. Telephone no.:
   d. County of registration:
   e. Registration no.:
   f. Expires on (date):

5. ☐ **Declaration under Code Civ. Proc., § 585.5** (for entry of default under Code Civ. Proc., § 585(a)). This action

   a. ☐ is ☑ is not on a contract or installment sale for goods or services subject to Civ. Code, § 1801 et seq. (Unruh Act).

   b. ☐ is ☑ is not on a conditional sales contract subject to Civ. Code, § 2981 et seq. (Rees-Levering Motor Vehicle Sales and Finance Act).

   c. ☐ is ☑ is not on an obligation for goods, services, loans, or extensions of credit subject to Code Civ. Proc., § 395(b).

6. **Declaration of mailing** (Code Civ. Proc., § 587). A copy of this *Request for Entry of Default* was

   a. ☐ **not mailed** to the following defendants, whose addresses are unknown to plaintiff or plaintiff's attorney (names):

   b. ☑ **mailed** first-class, postage prepaid, in a sealed envelope addressed to each defendant's attorney of record or, if none, to each defendant's last known address as follows:

     (1) Mailed on (date): 7/15/19

     (2) To (specify names and addresses shown on the envelopes): DAVID R. SINGER JENNER & BLOCK LP. 633 W. 5th ST #3600, L.A. CA 90071-2054

I declare under penalty of perjury under the laws of the State of California that the foregoing items 4, 5, and 6 are true and correct.

Date: 7/15/19

MARCUS SILVER
(TYPE OR PRINT NAME)　　　　　　　　▶　　　　　(SIGNATURE OF DECLARANT)

7. **Memorandum of costs** (required if money judgment requested). Costs and disbursements are as follows (Code Civ. Proc., § 1033.5):

   a. Clerk's filing fees . . . . . . . . . . . . . . . . . . $ 435.00
   b. Process server's fees . . . . . . . . . . . . . . . $
   c. Other (specify): $
   d. $
   e. **TOTAL** . . . . . . . . . . . . . . . . . . . . $ 435.00
   f. ☐ Costs and disbursements are waived.
   g. I am the attorney, agent, or party who claims these costs. To the best of my knowledge and belief this memorandum of costs is correct and these costs were necessarily incurred in this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 7/15/19

MARCUS SILVER
(TYPE OR PRINT NAME)　　　　　　　　▶　　　　　(SIGNATURE OF DECLARANT)

8. **Declaration of nonmilitary status** (required for a judgment). No defendant named in item 1c of the application is in the military service as that term is defined by either the Servicemembers Civil Relief Act, 50 U.S.C. App. § 3911(2), or California Military and Veterans Code section 400(b).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 7/15/19

MARCUS SILVER
(TYPE OR PRINT NAME)　　　　　　　　▶　　　　　(SIGNATURE OF DECLARANT)

**REQUEST FOR ENTRY OF DEFAULT**
(Application to Enter Default)